Welcome back. You may proceed. Good morning, Your Honors. Jack Fairling for appellants, St. Luke's Health System and Salzer Medical Group. If I may, I'd like to reserve two minutes for rebuttal. May it please the Court, this is a most unusual case. The district court explicitly found several significant consumer benefits that would flow directly from the challenged affiliation of Salzer Medical Group with St. Luke's. Specifically, if left intact, the affiliation would improve patient outcomes. It would promote the movement toward integrated value-based health care that the court itself characterized as a consensus solution to the cost and quality concerns about health care delivery. And the affiliation was intended to increase access to medical care for the Medicaid and Medicare populations in Canyon County. Indeed, the court went so far as to compliment St. Luke's for its foresight and vision. We are not aware of a single case in which a transaction that offered so many consumer benefits was held on lawful under section 7. This is an argument that even if it facially violated Clayton 7, your defense of beneficial results should have been accepted by the court as a matter of law? The court should have considered the beneficial results. We don't think for a moment that it facially violates section 7. Okay, no, I understand. But let's assume for a second. The court, the beneficial results of the merger are a defense to a section 7 claim, are they not? That is correct. We don't believe they even made out a primary case. I understand that point, but I want to start where you started. The judge did consider these. He noted them and applauded them. But was he then required, if he found a section 7 violation, to excuse it because of these beneficial effects? No. The way it's supposed to work, he's supposed to first look at the prima facie. And then we have a defense in which we need to show the pro-consumer benefits. Right, so let's assume there's a prime. We're saying the same thing, so let me finish. Let's assume there was a prima facie case, and then he found all these benefits. Is it your position that these benefits require as a matter of law that he find in your favor, or is it your position simply that he should have considered them as a matter of fact? He needed to weigh those benefits in the competitive analysis, which he did not do. He dismissed them by deeming them not merger-specific. Okay, and that was leading to my next question. Why were they merger-specific? The judge said they could be achieved through mechanisms other than the merger. Right. A benefit is merger-specific if it would not have occurred or would have occurred less efficiently absent the transaction. Here the judge himself, the court itself, found that in this transaction the parties had looked to a looser affiliation, to other affiliations. They found that it really didn't work, so they decided that this was the way to go in order to achieve these transactions. Why is that conclusive on the court? I mean, the parties to the transaction like the transaction, so it's easy for them to say, we considered alternatives, we tried a few things, didn't work, so now let us merge and take the lion's share of the market to ourselves. Why is the district court compelled to accept the variation given by defendants? The district court is not compelled, but merger-specific means, Your Honor, that the benefits would not have occurred or would not have occurred as efficiently in the absence of the transaction. And we believe we clearly demonstrated that, and we think the court's findings certainly support that. And the effect of the court's approach here was to shift the burden on to the defendants to prove that this could not have been achieved in a manner less restrictive of competition, when, in fact, the decisions of this court in both the Bond case and in the Harrison case say that the way it's supposed to work is the plaintiffs have to make a prima facie showing of the violation. The defendants then can rebut that by showing countervailing consumer benefits, which we believe we have, but the court didn't even get into because he deemed them non-merger-specific. And then the burden shifts back to the plaintiffs to show that these benefits could not have been achieved in a manner less restrictive of competition. But what the court did was he put the burden on us to do that, and that runs directly contrary to what this court said in the Bond and the Harrison case. Now, let me say that we believe that the court made five fundamental errors here, and the first two go to what Judge Hurwicz was talking about in terms of the prima facie case. The court wrongly found that the single town of Nampa is the relevant geographic marker. Why, what do we review that determination? Do we review that determination for clear error? Isn't it a factual determination? No, that is a legal question. The question is what is the standard? How legally? What does the court have to look at? No, I'm asking a different question. You may be arguing that he used the wrong standard in determining it, but the ultimate determination is one of fact, is it not? It is one of fact if one applies the correct legal approach. And the Eighth Circuit in the Tenant Healthcare said that the critical question is what consumers would do in the event of a small but significant price increase. That's how one determines the relevant market in this area. So basically I think, and the judge did use the SSNI approach. He mentioned the SSNI, but he said the only question is what insurance companies would do. He did not ask the further question of what consumers would do. Well, I thought he did. I thought he asked the question of would consumers be likely in the imposition of an SSNI to switch their PCPs. He did not. He specifically, if you look at finding 55, I think you'll find that he asked the question, what would insurance companies do? He did not ask the question what would consumers do in the event of a small but significant price increase. Counsel, forgive me. I thought that the judge found that in this situation that virtually all of the transactions between patients and the doctors here was done through the intermediation of the insurance company. So wasn't the relevant, in quotes, buyer here the insurance company, not the patient? The court said that the relevant buyer was the insurance company. That's exactly what he said. What's wrong with that? Because in the real world, initially the insurance company is the buyer. But then once you have a plan, the consumers, the patients decide which providers in the plan they will choose to purchase their care from. So the court was fundamentally wrong in saying that the consumers are not part of the You say part of, but how would you, if you were the district judge in this situation, in making the determination, the SSNIP determination, would you have eliminated the insurance company and just considered the effect of doctors, patients? Would you have included the insurance companies and the patients? And if so, in what fashion? I would have first looked at the insurance companies, as the court did. But then after that, once we have the plan in place, then I would have looked, as the 8th Circuit said, must be looked at. In fact, they said it was the decisive question as to what consumers would do. Well, the district court did that. No, he did not. Findings of fact 65, 66, 67 are all about where NAMPA residents go. He said in finding 55, Your Honor, that 32% of NAMPA, or he said that 68% of NAMPA residents get their care in NAMPA, which, of course, the corollary is that 32% already get out. But we have in this case, for example, Half of which work in Boise. Excuse me? The next finding is that 15%, half of those that get their health care elsewhere work in Boise, which is why they get their health care in Boise. The next finding was 15% get it in Boise, but there's also Meridian and Caldwell. But there is, in this case, a very important natural experiment. Micron, a very large employer. Located where? In NAMPA. They have residents in NAMPA, but where's the plant located? Where's the clinic located that people go to? Well, I don't think that's particularly relevant. Completely relevant, because you're talking about where people get their health care. The Micron plan was set up to encourage people to go to the clinic affiliated with the plant. Where was that? You're telling me they were willing to go elsewhere because that's where the clinic was located? That doesn't tell me very much. It's not a question of where they were willing to go. When they changed the co-payments, when Micron changed the co-payments, by a very small amount. Well, much larger than an SSNI, correct? No, it was actually approximately, it depended on what procedure and what time we're speaking of. But by the government's admission, on page 35 of their brief, it's $7. Well, here's my question. I might find Micron compelling. The judge did not. He didn't even consider it. Oh, he surely did. He discussed it. But whether or not he considered it, I don't know what he considered. We can't tell in his mind what he considered. Are you arguing this evidence is so compelling that he could not reach any conclusion but that consumers would prefer to get their care in Boise if it were only a bit less expensive? I think if you look at two facts, if you look at the natural experiment. But you're arguing the evidence. My difficulty here is you're arguing the evidence. So are you arguing that the judge, on this evidence, there was only one conclusion the judge could reach? No, I'm saying he didn't even ask the right question, which is what consumers would do. If you look at the findings, he really doesn't ask the question, what would consumers do? And there are two critical facts here. One is the Micron experiment, which I mentioned. The other, as Judge Clifton said, he found that, by negative implication, that 32 percent of NAMPA residents already get care outside of NAMPA. So he should have then asked the question, what would happen if there were a small but significant price increase to see patients in NAMPA? With 32 percent who already work in Meridian and Boise and elsewhere, if there were a small but significant price increase, one can certainly expect that a significant number beyond those 32 percent would get their care outside of NAMPA. But didn't that see my reading of the judge's findings, and I think Judge Clifton read some of them to you, is that he found precisely to the contrary, that if there were an SSNI, most NAMPA residents would continue to prefer to get their care in NAMPA because of two things. First, it was such a small increase. And second, because the increase was going to be filtered through insurance, which is the large extent of which their employer is paid. So I'm trying to figure out why any of those findings by the judge are so unsupported by the record that we should overturn them. They strike me as intuitively correct, and he's got some evidence that they're true. I think he said correctly that most people would prefer to get care near where they live. And that if the price of it were raised a little bit by a monopolist, that wouldn't matter to them because by the time they pay for the care, they're only paying for the deductible. No, I don't think he really said that. Finding of fact 71. Do you have finding of fact 71? I have it right here. Given this dynamic that health plans must offer NAMPA adult PCP services to NAMPA residents to effectively compete, NAMPA PCPs could band together and successfully demand a 5% to 10% price increase or reimbursement increase from health plans. He did say that, but he said that without looking at the question. Let's start. He did say that. So isn't that the finding, in fact, he made that you were telling us before he hadn't made? No. He did say that. He certainly said it. Okay. So now you're arguing that there's not evidence to support it. No, what he said was that the providers in NAMPA could band together and impose a price increase. But he didn't look at the question of what would really happen if there were a price increase. We submitted evidence, which he also totally ignored, of the critical loss of NAMPA. With all due respect, I find your position impossible to understand. He is plainly saying that he thinks, he finds, that the health plans have to have NAMPA physicians because the residents won't leave town with the tiny increases from their pocket for the reimbursements. I believe he is. If you're trying to tell me that there's simply no finding to that effect, you can tell me that, but I don't believe it. No, I'm not telling you that. He certainly said, Your Honor. You also have the issue that you're saying that the judge didn't consider it. What you're dealing with is that he didn't agree with you, but he did get it. He got the evidence, he considered it, and he came to a different conclusion than set forth in the findings of fact. Okay. Now what happened? I really don't believe he asked the decisive question, but that's for Your Honor. There's two ways you could approach this. One is to say the judge applied the wrong legal standard. Yes. And we'd review that de novo. Right. And very eagerly, I think. But you're arguing that the judge found the wrong facts. There wasn't any evidence to support those facts. I'm having a lot of difficulty with that argument because, you know, everybody's got an expert in this case that testifies the way they want their expert to testify, so there's some facts to support everything. That's absolutely right. To the extent that he found facts, it's our position that he found them by applying the wrong legal standard. What was the wrong legal standard that he applied? We don't think that he asked the decisive question of what consumers want. He did ask. See, that's my difficulty. He answered the question. He may not have asked it. Judge Clifton read you the finding where he said consumers aren't going to move to Boise if there's only SSNI. What's the wrong legal standard that he applied? He found that fact. That's the relevant fact. You say it is. What's the wrong legal standard? The wrong legal standard is, I believe, apparently the court doesn't agree, but I believe that he really didn't look at the evidence in the case based on the question of what would consumers do in the event of a small but significant increase. Let me just say. Let me try to help you because I want to break this down. Let me just say one thing. In the tenant case, there was evidence that 22% of the consumers already got care outside the relevant market, and the court basically said that alone should tell you that if there's going to be a price increase, there are going to be more people going such that it will not be profitable to impose a small but significant price increase. That was a finding of fact made by the district court in that case. Actually, I think that reversed the district court. That's what the 8th Circuit said on appeal. So that's why your legal position is that if there are 15% that go outside the market, then the government cannot make the care. If there are 32% who go outside the market before an increase is even put in, the government can't make that. And you rely on tenant for that proposition. Tenant, right. Any other cases that establish some percentage of number? That's the only one. But I would also note that although it's a little different in the bond case, the court questioned whether a single town in eastern California could be viewed as a relevant market, although it didn't really get into the analysis. So the other thing, then having established the market being NAMPA adult care services, the court then found its likelihood of anti-competitive effect largely in the separate issue of ancillary services. Yeah, I want to focus on that for a second. And I know your time is running down, but bear with me. On ancillary services, the court, and we're talking here about hospital-based ancillary services, are we not? Yes. For hospital-based ancillary services, the court makes no finding of market power, does it? No finding of market power, no finding of the presence of entities like Quest and LabCorp, these national organizations, no finding with resources. Isn't this really a tying argument masked as a Section 7 argument? Isn't this really an argument the government is making, which is that once St. Luke's merges, it's going to tie its hospital-based ancillary services to the rest of it? Yeah, they're arguing for a cluster market. That's right. They're arguing for a cluster market, but they didn't prove a cluster market at all. They're arguing that all these things are part of the market, but we don't really know from the record in this case whether there are contracts between payers and providers which steer patients to different ancillary service providers. We don't know about the presence of Quest and LabCorp and others. And let me ask you a couple of questions about the record, because I want to ask the government these questions too, so I want to make sure we're in the same wavelength. All I see in the record with respect to whether or not hospital-based ancillary service prices will be raised is something where the St. Luke's people say, we hope to get more revenue out of this area. That's in the record. But is there anything in the record about them raising prices in this area? No, there is none. And, in fact, what is in the record is that a lot of these price increases were by virtue of regulation, where under Medicare regulations you do, if a service is provided in a hospital, you do automatically if you qualify as a hospital-based service. So last question at this point, for me at least for now. Let's assume that the findings of the district court were wrong with respect to hospital-based ancillary services, but they were supported by the evidence with respect to everything else. I know that's not your position. Right. What do we do? I think you had a minimum remanded to the court to reconsider these questions. But if the evidence and the findings will be sufficient to support the court's decision if we pull out the ancillary services part, why shouldn't we just affirm? Well, number one, I don't think the evidence is sufficient. You're not hypothetical. You're not conceding anything. I've got a very little bit of time. I'd like to just analyze for a moment the remedy here. We'll give you a little bit more time. Answer my question. Go ahead and answer the question. We'll still give you a chance to speak. I've actually got a number of other points, but okay. We won't give you all of the points, but this is an important case that we want to take the time for. It's nationally important. So answer my question. Let's assume we conclude, contrary to your position, that the district court's findings on everything else were supported by the evidence, but that he was wrong in finding that there was an effect on the ancillary services market. You think we should remand. My question is, could we simply ignore the ancillary services evidence and still affirm? No, because I really don't mean to quarrel with your hypothetical, but I really don't think there's any evidence in this record of a price increase in the market that he used for concentration purposes. I know, but you are quarreling with my hypothetical. I know you don't mean to, but you are. So don't quarrel with my hypothetical. Assume you lose on your other arguments but win on this one. What do we do? Then you would, of course, have to look at whether the court properly dismissed these pro-consumer benefits, which we think the court did. You'd also have to look at did he correctly place the burden on the defendants on the issue of less restrictive alternatives. Notice the effect of that is. The effect of that is to say that when a physician group in a midsize market wants to affiliate with a hospital, all it can do is a very loose affiliation. So thereby, basically, you would be saying that in this kind of situation, you can never have a situation like Kaiser Permanente or Mayo Clinic or any of these other things because the antitrust laws require that there be a loose affiliation. So I think you'd have to look at this burden shifting issue and whether the court really put in a burden on us that under the court's precedence in Bond and in Hairston are on them. Let me speak to the remedy. You would also, I think, want to ask yourself this question, if you'll permit me, and that is where does the Affordable Care Act fit in on all these things? And I think the government tries to paint us as saying that the Affordable Care Act somehow houses the antitrust laws. That is not our position at all. I think when you look at these consumer benefits that we are articulating, the better care, the greater access to care, ultimately the transition to value-based billing, I think you need to give those things great weight because they advance federal policy as articulated in the Affordable Care Act. This may be the 800-pound gorilla. Everybody seems to be talking about changing the structure of how we deliver health care benefits or health care services and benefits that have been identified in a different structure. But the structure is one that appears to be something of a monopoly. We're going to integrate everything. So you have single providers with the lion's share of the market. Now, it may be health care becomes a regulated monopoly, but I'm not sure how we deal. I mean, the Clayton Act doesn't give us an exception for this field, doesn't treat health care as a regulated industry. So how is it we're supposed to make the transition if, in fact, and I'm back with a hypothetical like Judge Hurwitz is posing, if, in fact, we accept the findings of the district court that there are these anti-competitive elements that with this merger you're going to have somebody who controls 80% of the market and has enormous market power, but there are these benefits that we're supposed to weigh against it. How do we do that within the Clayton Act? Can you really have somebody with 80% of the power? Well, of course, that's going to assume that NAMPA is the relevant market that we've discussed. Your hypothetical is going to get fought. But let's go back to the basic facts of this case. As of 2011, St. Luke's didn't have a single adult primary care physician in Canyon County. In 2011, in the fall of 2011, it acquired seven and later eight adult care physicians. So now adult primary care. Making itself the second largest competitor in the market. No, the judge said that, but the undeniable fact is that there's tremendous competition from St. Alphonsus. The real competition in this market is between the integrated delivery systems, between St. Luke's and St. Alphonsus. We didn't even have a presence in Canyon County until 2011, and then we had eight physicians, and now we've acquired a few more. To say that we have this huge monopoly that is somehow going to result in higher prices is just a blink reality. And further proof of that is that when this merger was announced, there was a negotiation, after the merger was announced, there was a negotiation between Blue Cross and other payers and St. Luke's, and the prices did not go up any more than they had before. They had just been normal, non-anti-competitive price increases. And significantly, there's not a single finding by the court that any of these price increases we're talking about were anti-competitive. So I think you should be absolutely worried as a panel, you should be worried about some monstrous monopolist coming in and monopolizing the market and raising these prices. But the fact is that's not what we have here. He completely discounted this huge entity, St. Alphonsus, which incidentally owns and controls the only hospital, the only full-service hospital in Canyon County. So I think while your concerns are absolutely justified. Well, everybody has accepted the relevant product market as being adult primary care physician services. And at the end of the day, if this merger stands, according to these findings, if you accept this is the relevant geographic market, one entity has 80% of that market. Isn't that troublesome under the antitrust laws? That's why it's so wrong to accept NAMPA as the relevant market. I see why you're fighting that issue. But you come in starting with the pro-competitive benefits identified and basically say they should be taken to outweigh the anti-competitive elements. And I'm saying, well, how do we do that if, in fact, unless you win on knocking down the anti-competitive findings, I'm not sure how any court can take these pro-competitive benefits to outweigh the monopolist. I think the law is that if there are significant pro-competitive benefits, particularly pro-competitive benefits that advance federal policy, unless there are very clear anti-competitive effects, which we don't see here, then I think. Well, effects are tough to gauge in a fight in Section 7 case. We're looking at what's going to happen in the future on both the anti-competitive and pro-competitive side. We don't know that integration is going to lead to all of the identified benefits. And that's why this court's admonition in SIUFI is so relevant in this case. If we really aren't exactly clear of what the ultimate competitive consequences of this transaction are going to be, the court should really exercise extreme caution before it finds a transaction. Aren't we also really not sure of what the pro-competitive benefits would be? The judge found this was intended to do all those things. No. He didn't find, as a matter of fact, that all these things would occur, did he? Well, he found that they were intended to improve patient care, and he further found that if allowed to go forward, it would have that effect. Well, did he find that? He had a specific finding. You'll find that, I think. That these would occur, that if this went forward, that patient care would improve and that costs would go down. He didn't find that costs would go down. No, I know. But he did find that patient care would improve. Okay. That is a specific thing. It's either page three or page four of his findings. You will see he said, if left intact, it would improve patient care. Okay, so let me move on to the remedy point, if I might. In ordering the vestiture, the court relied on language from cases in which each of two conditions was present. First, the vestiture would clearly re-inject competition into the market, and second, the transaction in question would not offer significant consumer benefits. So in those cases, there was every reason to order the vestiture. Here, the record, at a minimum, makes clear that there is a strong reason to question whether the vestiture of Salser would, in fact, enhance competition. There is a tremendous amount of evidence indicating, as we believe, that the likely effect is that Salser will not only not be an effective competitor, it will cease to exist. What should the remedy have been? Excuse me? What should the remedy have been, from your perspective? The remedy should have been some kind of conduct remedy, and that comes directly from the ruling of this court in the Miller case that I mentioned earlier. And there, the court, Judge Kaczynski says in the Miller case, that injunctions, including statutory injunctions, quote, should only issue when supported by the equities, that's a quote, and that, quote, the public interest is a factor which courts must consider in any, in any injunctive action in which the public interest is affected. And in the Miller case, Your Honor, this court explicitly noted that two key elements of the public interest in health care transactions are quality of medical care, which the court specifically found would be enhanced by this transaction, and innovation in health care industry, which the court also found, in fact, That's wonderful, but let's talk about specifics. How would this work? You're saying the district court should have fashioned an injunction that would govern how the doctors would operate vis-a-vis the insurance companies? No. First of all, I'm sorry, I didn't mean to interrupt. I apologize. No, I'm asking how this would work. No. First of all, I would say the court should, at a minimum, have considered these issues. He felt that he had to issue an injunction. I understand. I'm asking you as counsel what he should have done. If you were the district judge, and believing as you do, what would you have done, aside from dismissing the case? But if there were a remedy, what would the remedy be to correct the anti-competitive problem that's been identified? I can give you three possible remedies that he could have considered. The one that we advocated is if he was concerned about the combined market power of Saltzer and St. Luke's, he could have put in an order that said that for fee-for-service contracts, which is what he's primarily concerned about, that Saltzer and St. Luke's have to negotiate those fee-for-service contracts independently of one another. That was a remedy that was imposed in the Northwestern case. The FTC doesn't like it, but he certainly could have done that. Lots of reasons not to like it. What's the second one? The second is he could have said that price increases cannot exceed a certain standard. For example, consumer price index all medical products. So if the concern here is that prices are going to increase, he could have said, okay, I'm going to let you go forward and have these consumer benefits, but I'm going to limit your ability to raise price more than set up. Doesn't that get the district court in basically the price control business? Because then you've got the doctors coming and saying, look, all of a sudden my costs have gone up by X. If you don't let me go up right away, I'm going to stop servicing these people. I'm out of here. Isn't that a bad scene for the district court to get involved in that? Well, first of all, I think he should have considered it and weighed the equities. But if the concern here, he seemed to be very sympathetic in many ways to this transaction, but he was concerned that it was going to raise price. He's also concerned that he didn't want to be where the prices are in Nampa over the course of time. That's what Judge Smith is asking. If he enters that sort of injunction and people keep coming back to him and saying, well, we thought consumer price index would work, but medical costs have gone way up and we're now losing money, isn't the judge going to be constantly involved in price determinations? You go to the grocery store. I go to the grocery store. I don't find that my cost of groceries or gas or anything else is reflected in the consumer price index. It says it's going up one whatever percent. Prices are going up a lot faster. So how does that help in this case if you limit it to some kind of a CPI? Well, I'm not using a CPI of all products. There is a separate component of the CPI that deals with medical services. So he could have just said, listen, if I'm concerned about price, I'm going to say that the results of these negotiations with the insurance companies should not be higher than X percent. How about not higher than what St. Alphonsus gets? Would that be appropriate? Well, that might be court-imposed price fixing. No, no, I'm asking you, could the court say, I want you not to exercise your monopoly power, so I want you not to accept reimbursements any higher than your competitors? That's certainly something he could have said. But he said that? I think he could have said that within his power as a chancellor, the equitable remedial power of the court. They get to investigate the internal records of the opposition and see what they're charging. Is that what's happening? No. Or he could have said, you know, the state of Idaho, as you know, is a plaintiff in this case. He could have said, okay, the state needs to review any price increase. No, I'm trying to do something that doesn't involve the judge in making price determination. He could have delegated, he could have said to the state, you look at the price increases. Because your answer to my previous question fascinates me. I want to pursue it for a second. Could he have said, what we worry about with monopolists is them raising their prices higher than their competitors. So we're going to limit your prices to the price of your competitor. Whatever St. Alphonsus charges for reimbursement, you can go no higher. I think that's something that would have been within his equitable remedial power. You want to get together with these guys. In other words, he couldn't have said you could collude, you couldn't collude with St. Alphonsus. St. Alphonsus presumably will be doing its best to increase price. And he might have said, okay, whatever St. Alphonsus comes up with, you can't exceed that. There's all sorts of permutations. There's all sorts of issues. But the critical fact here is the court didn't consider any of them. He didn't look for any creative solution. I thought he said he didn't want to increase price higher. I don't think he said that. Okay, maybe I used the wrong term. But what's your third possibility? I may have squeezed it out of you already. Yeah, I think you've already squeezed it out of me. If he didn't want to be involved in being a price higher, he could have said, I'm going to establish the state of Idaho as reviewing these price increases in advance to determine whether they are reasonable or whether they're consistent with other price increases or what have you. Plus, I'm just sitting here. I'm one person sitting here at this lectern. My guess is if we had had a hearing on this and had brought in advance experts to think about that, we could have come up with other creative solutions. Do you agree that every one of these solutions is fraught with bureaucracy, potential collusion, and a guaranteed bunch of new lawsuits trying to remedy a system that's gone awry? Absolutely, I would not agree with that whatsoever. First of all, the solution that we advocated, which was that St. Luke's and Salter had to negotiate contracts independently of one another, that has no bureaucracy, that has nothing. And the court specifically rejected that? I mean, you keep telling me he didn't consider it, and I look down at these findings of fact and conclusions of law, and he discusses it. This is on CR 58. I don't have it right in front of me. My recollection, Your Honor, is that the court said, were it not for the Clayton Act, it might be a good idea to let this. The court also rejects St. Luke's proposal that divestiture be dropped as a remedy in favor of ordering that St. Luke's and Salter negotiate separately with health plans, and the next three paragraphs are all on the same subject. So, you know, if he did consider it, don't tell me he didn't. If you have reasons to object to it, that's something else again. But you've got a recurring theme here. He didn't think about this, he didn't think about that. And I've got to tell you, my review of the record suggests he thought about a lot of these things, and he dealt with them. He may not have dealt with them correctly, but he dealt with them. Well, let me say to Your Honor, this court in the Miller case said that the public interest should be a major factor in deciding what kind of injunction. Yeah, but you can't tell us he didn't consider it. You can tell us he didn't weigh it highly enough. You can tell us that he might have reached a different conclusion. But when I read this record, I see a very conscientious judge considering all your arguments, dealing with them expressly, having hearings on them. So if you're seeking to get a reversal because you're trying to convince us the judge paid no attention to the evidence, I think you've got a really difficult case. I didn't mean to suggest, and I hope I didn't say that the judge paid no attention to the evidence. But what I am suggesting is the court itself found that patient care would be improved if this transaction were to go forward. He also commended St. Luke's for moving toward a value-based delivery of care, which he views, and we share that view, as the solution. But he made no findings that that would occur. The only finding he made was that patient care would be improved. But he also commended us for our foresight. I mean, he didn't make a specific finding, but if you read the beginning of the opinion, you'll see that he felt that we were very much on the right track, that we were doing the kinds of things that needed to be done. He really didn't consider whether he could fashion a remedy that would not lose those benefits to consumers. And this is where maybe we've reached the point of diminishing returns here. But every time when you say he didn't consider, I go to the record and you proposed a remedy, and he considered it and said, no, I really don't want to adopt that remedy. He did consider it. If he did, it was a very brief consideration. I can tell you because I was there at the hearing, he didn't ask any questions about it. It was not really discussed in any way in the hearing. Go back and read ER 50. I totally believe you. And then go back, when you listen to this or read the transcript of this, count the number of times you said he did not consider. We're not buy on that one. Okay, well, maybe I should have kind of added the word adequately to not consider. Anyway, thank you very much, Your Honor. And we'll still give you time for rebuttal because this is an important case. Thank you. Before we start the clock, such as the clock is, now you can go ahead and sit down. We have multiple attorneys sitting at the other table. So before we start the clock, give us guidance as to how it is you expect to proceed amongst the group of you. Absolutely, Judge Clifton. The way we had split our time between the two of us was that I'm Joel Marcus on behalf of the Federal Trade Commission, also arguing for the State of Idaho. I was going to take 13 minutes of the 20-minute allocation, and Mr. Ettinger was going to take the remaining seven minutes. Okay. I'm going to ask the clerk to put 13 minutes on the clock. Okay. We've obviously exceeded the time for the defendant, and we may well exceed the time for the plaintiff as well because this is important. We have some bounds, but we want to make sure that the private parties have an opportunity to participate as well. So let's divide the time. I think that's a very wise decision, Judge Clifton. May I begin? You may proceed. May it please the Court, I'm Joel Marcus, as I just mentioned, from the Federal Trade Commission, and I'm arguing on behalf of the State of Idaho as well. Mr. Ettinger is representing the private party plaintiffs. As the panel has recognized throughout Mr. Bierig's argument, this is an intensely factual case, and all of the district court's very careful factual conclusions were fully supported by the evidence before the Court. Let me tell you the one, and let me direct you to the one that I directed your opponents to. The only one of the factual conclusions I have difficulty finding support for is the notion that hospital-based ancillary prices will be increased. I have read that part of the record where St. Luke's executives say, in effect, we hope to get more revenue out of this market. Is there any direct evidence in this record that hospital-based ancillary services prices would be increased? Well, the direct evidence, let me step back a second, if I may, Judge Hurwitz, and say that one of your questions to Mr. Bierig was, does the Court even need to consider the ancillary services aspect of this? And I think the answer to that question is no. Okay, but now you're answering your answer. No, I understand. The question I asked him. Okay, I'm asking you a different question. The question I'm asking you is, is there any direct evidence in this record that hospital-based ancillary prices would be increased? Well, when you say hospital-based, what is going on here is that under the standard Medicare approach and also part of the Blue Cross contract, when a medical practice, a clinic, is designated to be part of a hospital system, the exact same medical services provided in the exact same way in the exact same place by the exact same doctor. With respect, you're answering a different question. I have two questions on this, and you're answering the second one. I want to know the first one. Is there any evidence in this record that however, whatever amount of hospital-based ancillary services may flow to St. Luke's after the merger, that it will increase its prices for those services? Okay, so I think that's a yes or no question. I think the answer to that is the court found that prices would rise. I know the court found that. I'm trying to find out what evidence supports that finding. So there's significant evidence by the witness from Blue Cross of Idaho and by the government's expert, Dr. Drainoff, that when the parties negotiate these contracts, they can distribute the increased cost. The increased cost that is a result of the accumulation of bargaining power that St. Luke's gets as a result of this acquisition, and they can distribute that across the range of services. But that's indirect evidence, isn't it? That's evidence that perhaps when they make a cost increase, they may attribute it to hospital-based ancillary services as opposed to PCP rates. My question, I meant it to be very narrow. Is there any evidence in this record that somebody said or that there's a past history of increasing hospital-based ancillary service prices? Okay, there's certainly evidence in the record from St. Luke's consultants giving financial projections of where they think the money is coming from. Remember, projections talk about increased revenue. Do they talk about increased prices? Well, increased revenues basically are the same thing in this country. Oh, no, they're not? My father had a men's clothing store, and he sold shirts for $10. And if he sold 10 shirts, he made a certain amount of revenue. But if he sold 100 shirts, he made 10 times more revenue. Well, the amount of revenue at stake is quite large. So is there some proof that the revenue increase has to be tied to increased prices as opposed to increased volume? Let me add a corollary to that, because we've already heard and you've already told us that with regard to Medicare, the government system is set up to pay differently. But we're focused here. You also added Blue Cross. So I'm looking, as Judge Hurwitz is, at price increases focused on the market that we're concerned about here, cutting out the possibility of making more money out of Medicare. And so under the contract, when the service is provided by a practice that is now a part of the clinic, that is now billed out at the higher hospital-based rate. But is there any evidence? That's your second point. Is there any evidence in this record that these Salser physicians, who were previously doing summer ancillary services right there in their clinic, are going to say to their patients, you know, now that we're affiliated with St. Luke's, rather than drawing your blood here, I'm going to make you go 30 miles to St. Luke's Hospital to have it drawn? But I think the insidious point here, Judge Hurwitz, is exactly that that doesn't happen. They say, let me draw your blood here the same way I did last week, only now when I send the bill to the insurance company, the insurance company gets billed at the hospital-based rate. Good, good. You've gotten exactly to the point. There is a possibility under this circumstance that the PCP doctors will commit fraud. Tell me what evidence in the record there is that the PCP doctors will say, I'll bill you at the higher rate simply because I'm now affiliated with St. Luke's. Well, that's part of the contract. Part of the contract doesn't require them to send ancillary services to St. Luke's at all. No, it's just the contract deals with the billing for the service, and so they drew the blood yesterday, they drew the blood today, and they send a bill. Under the contract, until it's changed, the contract allows the higher billing rate because it's now a hospital-based service. In the next go-round of the contract negotiations, Blue Cross could come to the table and say, you got us on the hospital-based billing for the ancillary services in the last contract, but we are changing the contract to prohibit that billing practice, and that is the real problem here. The judge found that the St. Luke's Seltzer combination with the 80 percent market share would have enough bargaining power to make it stick. That was the judge's exact phrase. That came from the testimony of the expert. I've got the same concern that Judge Hurwitz has expressed because I don't understand how that market power—let me start this over again. You've made reference, and there's references that they're negotiating all this stuff together, and so it's the bottom right-hand corner that's all that anybody cares about and so forth, and they can allocate the line items on the spreadsheet as you will, but they have no power in the ancillary services market as such, and things happen I don't understand all the time, but I really wouldn't understand why Blue Cross is prepared to pay $15 instead of $10 for the service performed at exactly the same place simply because there's now a hospital affiliation involved, and that's why Blue Cross comes in your scenario back to the table the next time and say, Okay, you got us, but we're not—fool me once, shame on me. So what power is there in the ancillary services market that's going to make an anti-competitive price increase there stick? So once again, Judge Clifton, the question isn't power in the ancillary services market. The question, the real question, the fundamental question here is power in the PCP market. So you're saying a price increase in PCP market is actually being tucked away in this other line item? Very much so. So does that hurt your argument about monopolization of the PCP market? No. If in fact the PCP price is not increased as much as it could be because you're shifting the increase to someplace else, then how can you count that potential price increase in your prima facie case? Well, remember the Clayton Act talks in terms of May. It doesn't talk in terms of will. So the question is could the PCP price increase, and the answer to that is absolutely yes. The PCP price could increase. I agree with that. So that's all we need to show to show Clayton Act. That's your Section 7 case. I understand that. But what you're now saying is that there's another problem we're worried about. They might not increase the PCP price to make their profits. They might shift that increase over to the ancillary services market, and if you prove that, if you prove that they would shift that increase over, don't we subtract that percentage of the increase from the PCP price? Well, no, we don't, and the reason why is because the thing that allows them to get the overall price increase out of Blue Cross or any other insurance carrier is the market power that they have gained in the PCP market. So the parties sit down at the table. Last year they struck a deal for X. This year St. Luke's now owns Seltzer. They have 80 percent market power, and they say, you know, we have 80 percent market power in Nampa. If you want our doctors in Nampa, we want X plus, you know, 5 percent, let's say. And Blue Cross says, okay, we'll give you the 5 percent. We can't afford to lose access to the doctors in Nampa. Has that happened? What's that? Has that happened? That hasn't happened yet exactly. I mean, there's a new contract that was negotiated, by the way. That contract allows a 5 percent overall rate increase when my understanding of the rate of medical inflation was about 1.5 percent. That's in the expert testimony. But setting that aside, the new contract in the record? Excuse me? New contract in the record? The contract? The new contract you're referring to? Evidence of the new contract in the record, but I don't think that the new contract itself is in the record. No, I'm getting a no on that. But there was testimony, some testimony about the new contract. Also, there's the general dynamics case from the Supreme Court that basically says that you can't put too much weight on a contract that's negotiated in the teeth of an antidote. I'm still having trouble with this. It seems to me if we have a problem in the hospital-based ancillary services market in Nampa, it's at the only hospital in Nampa, isn't it? Isn't St. Alphonsus much more in a position in the relevant market to say, look, if you want hospital-based services close to home, we're the only ones who provide it? No, the relevant market, of course, is the PCP market. And so if you think of the contract as, you know, a tube of toothpaste, when you step on the middle of the tube of toothpaste, it flows to either end. And because of the very complex and really unique circumstances of medical price negotiations, the market power in the PCP market, that's the product market that the defendants agreed with the plaintiffs, was the relevant product market. It's the market power accumulated in that market that gives the bargaining. So you're really making a tying argument, aren't you? You're arguing that if you want our PCP doctors, you're going to have to buy our ancillary service prices at a higher price than you would have otherwise. Isn't that what you're saying? In a sense, but the violation of the Clayton Act here is not a tying violation. I understand. It's a horizontal merger violation. It just so happens that the way these services all work together, that the power that you gain from the horizontal violation can be expressed in any one of a number of different areas. It could be, by the way, Judge Hurwitz, I'm sorry to interrupt. It's important to understand here that it could be that that price effect will be felt simply in PCP prices. That's happened before. So Mr. Clement from Regents, Blue Shield, testified that because of market power that Saltzer had in PCP services, they raised the rates for PCP services by five to six percent. So, you know, it's still a thing. I get your argument here, but let's assume for a second that we don't buy it, that we think the judge's finding with respect to ancillary services was not supported by the record. What do we do? Well, you affirm, and of course, because the judge found. I know there's sufficient evidence. Let me start by saying there will be sufficient evidence under my hypothetical for the judge to come out exactly the same way on remedy. My question is, how do I know that the judge in the exercise of his discretion didn't place at least some substantial weight on this ancillary services market, and why shouldn't we give him a second shot at it if we think he was wrong? Well, so the judge, if you look, for example, at finding a fact. I'm sorry, this is conclusion of law 25, page 53 of the excerpts of record. The judge finds, moreover, I'm reading this from the conclusion of law. Moreover, it is highly likely that the combined entity will use its substantial market share to, one, My question is, if we take out two, can we be confident that the judge, we review the judge's, let me just lay out this for you. We review the judge's remedy for abuse of discretion. And let's assume that if the judge had never found two, I wouldn't find an abuse of discretion. But he did find two, and I'm worried that he relied on it in coming in at the remedy. What do I do? Well, I don't think so, because the judge found a Clayton Act violation, and I think that there's, you know, the one or the two do not speak to the Clayton Act violation. So there is a Clayton Act violation, and that Clayton Act violation is the unlawful accumulation of power that will substantially interfere with competition in the relevant product and geographic markets. And so then you move to what's the remedy. Now, of course, the standard on review of remedy is abuse of discretion, and the Supreme Court cases are quite clear that in an FTC, United States government case, the default remedy is divestiture. The Ford case and a slew of others have said that the thing that you're trying to do is to restore the competition that was lost. And as long as there's a Clayton Act violation, the remedy, the default remedy, unless there's a very good reason otherwise, is to restore the parties to a competitive state. So the only way that really the judge, it's really, you know, that's the default remedy, unless the plaintiffs have made some very convincing case to the contrary. Does the remedy here really return us to the status quo ante? We've got a bunch of doctors who, you know, had affiliations with St. Luke's. They're going to be told not to have affiliations with St. Luke's. Do we know that they are going to affiliate as Salser again and be a competitor? Well, you know, they still exist in a way as Salser. There's a corporation. They have their website. This was a practice of doctors. It was the largest independent medical practice in Idaho, which had been around for 60 years. You guys got $9 million. Maybe they won't practice anymore. You know, there's no reason to believe that. You know, there was evidence presented to the district court. And I remind you, this case is intensively factual. There was a huge record here. There's evidence on virtually every point. And the defendants put on evidence. They put on an expert witness, and the expert witness testifies. She says, I cannot give you an opinion on whether Salser will survive. I cannot give you an opinion on whether the doctors will leave town. I cannot give you an opinion on anything other than the effect of the divestiture on one year, and the one-year effect is that the doctors will take a hit in their income, roughly proportional to the amount of increase in their income that they got from going to St. Luke's in the first place. And that's it. That's the only evidence that the plaintiffs – I'm sorry, that the defendants presented here. This is not nearly enough to overcome the presumption. And keep in mind, as the court just mentioned, they have their $9 million. They negotiated that $9 million payment as the thing that they needed to be essentially restored in the event of divestiture. They thought about this up front. And they entered into this deal knowing that the FTC, the state of Idaho, was investigating them. They consummated the merger. I'm sorry. No, no, go ahead. I was kidding. And with Judge Clifton's permission, I want to – I know you're over time, but we did this with your opponent, too. Some people here get paid by the hour. Luckily I worked for the government, so nobody's getting – There's no hospitalization going on here, Judge. So here's what troubles me in a large picture about this, and I want to return to something your opponent said. Let's assume that the Mayo Clinic wanted to open – or Kaiser Permanente, but I like Mayo because that's where I go. Mayo wanted to come to Nampa, and they came to each of these doctors and said, we don't want to buy your practice, as they do in most places. We don't want to buy your practice. We just want to buy you. Here's a contract. Come work for us. We'll build a Mayo Clinic in Nampa. No quaint knack problem, right? You know, I can't give you a definitive answer at a certain point. No merger. But they came to all of them at once, and we said, we'll take the whole lot of you. No, no, no. We'll enter into individual – we want you all because you're wonderful, and everybody in this case seems to think they are. And we'll give you each a contract equal to what you made. Hell, we'll spend that $9 million over the next five years. I think the critical distinction between your Mayo hypo and the actual facts that we have on the ground here is that St. Luke's already had a primary care practice in Nampa. Yeah, but I was going to change – They merged. They merged. I know, but you keep – everybody fights me on my hypos. Live with my hypos. If they had one doctor in Nampa and then hired the other 10 or 16 or 15, we wouldn't have this quaint knack problem. Quaint knack requires a merger. It does require a merger. It's an actual merger. And I can tell you I have been authorized to stand on behalf of the FTC, although I don't speak for the state of Idaho when I say this, but that if St. Luke's did not have a practice in Nampa before this merger and they simply went to the St. Luke's doctors and said, we like you, come work for us, that the FTC would not have brought this in. My question to you is wouldn't the anti-competitive effects of that situation be precisely the same as the one we're looking at today? No, it would not be, Judge Hurwitz, because St. Luke's already had a practice with substantial market share, and when they combined the two practices, they went to a practice with 80 percent market share. Well, but you're talking about conclusion. I understand why the Clayton Act covers this situation and not the other one. What's troublesome to me is that the other one, that combined entity, that new entity of Mayo doctors, 24 Mayo doctors with a primary care practice, all the ones who had practices before in Nampa, would have exactly the same amount of market power and affiliated with a Mayo hospital in Boise. So setting aside the Clayton Act. That's right, because the Clayton Act has to do with the merger, and I think it's our duty to merge. It's conceivable that at a certain point there could be a Sherman Act problem, you know, in terms of monopolization or something like that. But we're nowhere near that in this case. That's a different case. So your quarrel is with the mechanism by which they achieve this integrated entity, not the integrated entity, isn't it? Well, no, I think that, as I was saying a few moments ago, the entity now went from a 65 percent market share, you know, that's what Salter had, to a nearly 80 percent market share. I'm presupposing in my hypothetical an entity with 80 percent market share. Okay. Oh, okay. I didn't quite get that part of your answer. They achieved exactly the same result. Assume they never had a doctor there before. If St. Luke's comes into town and says, you 18 doctors, you're all really good. Let me finish the hypothetical. I know you won't accept it. Nobody accepts it. You 18 doctors are really good. We're going to pay you up. A boatload of money to come to work for us, to make it really attractive. And we'd like you to come to work for us right away. And we have a hospital, by the way, that we've already established in Boise. So, you know, we don't need to buy a hospital. And make my hypothetical exactly the resulting facts that occur here. That's okay, isn't it? That's not necessarily a Clayton Act problem in the PCP market, in the primary care market. So it's possible that it could be a Clayton Act problem in a different market. I don't know. It's possible, as I mentioned, that it could be a Sherman Act issue. I don't know. But isn't it kind of silly that we allow exactly the same result to occur by one mechanism, but forbid it by another? Well, you know, I point to Congress on that one. Congress passed their statutes, and the statute says you may not acquire a practice. You may not acquire assets that are going to substantially reduce competition. That's exactly what St. Luke's did here. It acquired something, and the acquisition caused. This is why your hypothetical doesn't really speak to this case with all due respect, because the acquisition here combined two practices, which increased the bargaining power, which decreased the level of competition in the market. And that's exactly what the case was. With respect, my hypothetical deals precisely with that situation. But the answer is the Sherman Act doesn't forbid it. The Clayton Act doesn't forbid it. The Clayton Act forbids this merger. It may not apply to a different merger. There's a question I'd like to pose, even if I make you work overtime, and that relates to something I'd raised with the Council for Defendants as well, which is that there seems to be a universal agreement that our health care structure is broken. We'd like to move to a model that integrates the pieces better, both for economic efficiency reasons and for health care improvement reasons. And how do we make that change? The argument made here and the finding of the district court was that, well, you could accomplish that kind of integration without a merger. There is evidence that, in fact, efforts were made by the physicians and those efforts were not successful. And we're all health care users. We all have our own observations how slow this transition is going. It's not hard to reason that integration will work more efficiently if they're actually all working for the same person or same entity. And so the question I pose, and I guess I'll throw one other factor in here, you can break up the markets in different ways. We've heard argument about whether breaking it up to a market as small as NAMP is appropriate. And I have trouble seeing how the nation moves to a different health care structure if, in fact, efforts like this are blocked because of the perceived anti-competitive effects. Now, the alternative may be legislation, although inviting Congress to delve back into health care may not be a real good thing in the near term. But I struggle with that because I see these benefits. The district court acknowledges the likelihood of the benefits. How do we get those benefits? So I have a number of responses, Judge Clifton. One is that there was a lot of evidence in the record before the district court judge on whether integration is necessary. The judge rendered a specific factual finding that there is no evidence on the record at all. And there was a question about whose burden is that? I take it your position is that the defendant's burden to carry the day on that issue. Well, I think that this court, the Ninth Circuit, has not directly addressed this issue. This court doesn't even recognize it as an official matter, an efficiencies defense at all. But the D.C. Circuit in the leading Heinz opinion, which, by the way, is not even mentioned by the defendants here, and ARETA, the leading antitrust treatise, both are very clear about where the burden lies. And so if I might just shift gears for a second and address this, Heinz and ARETA basically say if you're going to suffer or inflict on the economy the ill effects of an anti-competitive merger or a merger that results in that's presumptively anti-competitive, then you'd better come up with some very substantial reasons for why that's necessary to do. And so ARETA says it has to be concrete and specific, and Heinz says as well, and these leading authorities say that the effects have to be specific to the merger in the sense that they are unique and not, and this is a quote from ARETA, not readily attainable without the merger. So that's the burden, by the way, is the defendant side of things. Those authorities place this burden squarely. The judge finds, as a matter of fact, I think only as to patient care. He says, I'm convinced, I think that's probably a matter of finding, that this merger would lead to better patient care. He doesn't make any facts with findings with respect to prices and other things. Is that sufficient? He says, I believe this would lead to better care, and that's certainly a possibility. Believe is probably enough to get a preponderance finding. You know, I don't know. But what's clear about this record is that the defendant's own expert testified that it was speculative. It was a possibility. The court is convinced that it would have the effect if left intact. That probably makes preponderance. That's the finding I was referring to. But there's another. Just take that one. Forget everything else. So the judge says, I find that this merger would lead to better patient care. That's a merger. That's a benefit. Now the question is, is it merger-specific? Right. And I think under the standard articulated by Hines and Arita, that's not necessarily merger-specific. And in this case, it is not. So who has the burden of showing that increased patient care, just focusing on this one finding so we don't get caught up in fights about the record, couldn't have been achieved by any other mechanism? So Hines and Arita say that they have the burden to prove that. But I think that in large part, the court doesn't really even totally need to address that issue because the evidence was overwhelming that this was not merger-specific. And that was based on evidence that the plaintiffs put on, too. And that's why the judge finds in paragraph 181, this is at page 43 of the excerpts of record, this is a finding of fact, and this is based on a lot of testimony. He says, there is no empirical evidence to support the theory that St. Luke's needs a core group of employed primary care physicians beyond the number it had before the acquisition to successfully make the transition to integrated care. And that's why I was trying not to get off the page. He says there's no showing that they need to do that to go to integrated care. My question is a very narrow one. He finds, and Judge Clifton and I seem to be focusing on the same finding, that patient care would improve from the merger. Yes, but there's certainly no corresponding finding that patient care couldn't improve. Well, that's what I'm trying to find out. And that's the merger specificity point. Focus on that one. Does he have to find that patient care wouldn't improve without the merger? Or is it enough for them to show a merger specific benefit? Merger specific is a kind of a term of art as it's used in Aretha and Hines. And merger specific means something that is unique to the merger and not readily attainable without the merger. Okay, and whose burden is it to show? Again, Aretha and Hines. I know what Professor Aretha says, but I'm just saying. Well, I mean, you know, as far as the only law that's out there, the law is that it's never. And Aretha, you know, it's kind of. I like Professor Aretha. This court has relied on Aretha, you know, many times. And I think the DOJ FTC. It's like Professor Bork, too, in the other way. The DOJ FTC merger guidelines also discuss merger specificity in roughly the same way. So I want to understand what merger specificity means. So it's the burden of the defendant not only to show the benefit, but that an equivalent benefit could not be achieved in any other way. Is that what you're saying? Well, not readily attainable. Readily attainable. I mean, so it's not. They keep saying you have to prove the absolute negative. It's not really. But it's their burden in your view. Their burden to show. Because keep in mind just what's going on here is we have an anti-competitive merger. We have something that's going to inflict harm on society in the form of increased prices. Nobody wants that. There's going to be less competition in the marketplace. And in order to justify that, you need to show something. Can you respond to your opponent's argument? Because he has a different view of the merger specificity law. He says once we show a benefit specific to the merger, the burden shifts back to you to show that it can't be achieved in some other way. But it could be achieved in some other way. He's citing a couple of cases from this court that were decided under the Sherman Act. And the Sherman Act cases, ironically enough, simply recite a standard that was put forth in the Aretha Treatise. And so, you know, so if you're taking Aretha as the law here, you've got to take the bitter with the sweet. But you've anticipated my question to answer it. Why should we have a different standard in the Sherman Act? And the reason why is and we address this. The FTC's brief addresses this. And the fact is that the Clayton Act is phrased in very protective terms. It wants to protect against anti-competitive harm, quote, in its incipiency. That's from the Supreme Court case, many Supreme Court cases really. And so the Clayton Act looks at what might happen, what the possible effects of a merger are. And it says we don't want this to happen if it may have anti-competitive effects. And it looks forward and it looks at these things that, you know, that might happen. The Sherman Act asks only whether a behavior that's already happened, a contract, let's say, is reasonable. This court, in the Twin Cities opinion that we cite in our brief, recognized that the Sherman Act and the Clayton Act have different focuses and have different standards associated with them. I'll be happy to get you the site, you know. No, I've read your briefs. What struck me as slightly anomalous, and the law is this way, so the law is often anomalous, that when you prove actual anti-competitive conduct in the Sherman Act and the other side says, well, there's a benefit to it, then the government has to prove that there's no other way. But when you just anticipate anti-competitive conduct in the Clayton Act, the burden is on them to show both. You know, the Clayton Act says may. It's regarded as very protective of competition. It is, you know, this is longstanding law. I'm not just making this up. But the longstanding law is on the Sherman Act side. We have no law on the Clayton Act side other than the D.C. Circuit, so I'm trying to figure out whether to import it or not. So, I mean, if you're talking about new law, Judge Hurwitz, you need to keep in mind also that this court has no law on efficiencies defense at all. It's never been accepted into court. I'm not saying that the court shouldn't accept the concept of an efficiencies defense, but I think when you're talking about an 80 percent market share and you're talking about findings of fact that say there will likely be an increase in prices, there's a very heavy burden to show merger specificity. And, again, this is from Rita, from Hines, from cases that the FTC cites in its brief. I'd be happy to address some of the other issues, but I have to keep my quiet a bit. So, we would respectfully submit that the court affirm the judgment below in all respects. Thank you. Thank you, Your Honor. David Ettinger on behalf of the St. Alphonsus entities. I am paid by the hour, so I'm happy to take as long as you'll let me. If I could address. They're watching. We could just tell you could just go home and tell them it took 10 hours. Not by myself, Your Honor. And the last point that you were addressing with Mr. Marcus, I wanted to add something. The court very specifically found that these efficiencies were not merger specific in that same paragraph where the court said it thought these effects would have been effective left intact. It went on to say, but there are other ways to achieve the same effect that do not run afoul of the antitrust laws and do not run such a risk of increased costs. So, we believe that while the burden is on the defendants, you don't have to go there. And that the court found that, in fact, these were not merger specific and there was an enormous record to support. Well, but if the court, and I take your point, but if the court made the finding after imposing the wrong burden of proof, we probably would ask it to go back and figure out who had the burden, wouldn't we? Your Honor, given that he says. If the court said, I think the burden of proof in a criminal case is preponderance of the evidence and I find you guilty, we wouldn't say, well, he found him guilty anyway. The burden of proof leads to findings, doesn't it? If the court had said, irrespective of the burden, I come to the same conclusion. That's right. And that's what the court said, in effect, by this finding. I think the court said, this is ER 56, the court finds that St. Luke's has not carried its burden of showing convincing proof of significant and merger specific efficiencies. I think the court clearly put the burden on defendants. And if defendants succeed in persuading us the burden is not supposed to be on them, isn't there a problem? Your Honor, I'm suggesting respectfully there's not, because while the court did put the burden on the defendants, the court also went on to say, ultimately, affirmatively, that you can achieve it in other ways. And I think that's got to be read as saying the court made a factual finding. Without respecting the burden. That's right. That's what those words say. If it was the plaintiff's burden, they satisfied it because the court concluded there are other ways to achieve the same effect. Right there in its language. And I think the record more than supports that conclusion, Your Honors. I won't belabor that. The briefs are full of it. But everything they can do, we can do better. I mean, the evidence is very strong in area after area to that effect. The court had a substantial basis to find that whoever the burden is. Your Honor, Judge Clifton, on your policy question, I'd like to throw out one thought, and that is the record shows that St. Luke's did more than 40 acquisitions of physician practices before this deal. There is nothing to stop them if they think they can gain efficiencies from trying to gain it from the other 40. This is the only one that's been stopped because of an antitrust problem. And so the notion that there's a policy problem created by the application of the antitrust laws here, I think, is mistaken. Well, let's follow through. They will go forward. Presumably they've got the EPIC or EPICSYST or whatever the white flag. I got lost in the trade names. But they've got systems that are intended to help physicians and medical technicians and specialists and so forth all integrate their activities. And the question is, does that get extended to somebody who's not part of the big team? Sure, they're going to keep doing it in all the other communities where they've had their acquisitions, but what happens in NAMPA if the Salser physicians aren't part of that? Does that mean the patients that are going to see their primary care physicians at the Salser Clinic are left out of the benefits of integration? Your Honor, they have an affiliate EMR program specifically designed to link that up to independents, and 16 independent groups have indicated interest. This is a big program that St. Luke's has, and it's an example of why the judges' conclusions were correct, because St. Luke's was, frankly, crying wolf on an awful lot of things here. They said on their website, clinical integration with independents is what's critical here. Right on their own website, then they argued the opposite to try to get this merger through. They have a huge program, the record shows, to work with independents on epic. You go down the line. They've mentioned quality improvements in orthopedics. They were all part of an MSO including independent physicians in every single area. What they have achieved, and so far it is quite limited, included independents in it. And, of course, as Your Honors know, the record shows that in those 40 previous acquisitions, they've not been able to quantify any benefits, and their efficiencies expert didn't even look at the previous acquisition to see if they had. So the record is very clear, I think, Your Honor, that you can do these things without acquisition. Area after area, there's more than a substantial basis for the judge to reach that conclusion. Is your argument that with the previous acquisitions they attain no benefits, or is the argument that you have benefits that can be attained without the acquisitions? I think the benefits are yet to be seen. They're an experimental wave, as the judge said, and I agree he thought that that experimental wave would work. Well, it sounded like there was consensus on the present system not working well and the need to find a different system. Now, all of us get nervous when all experts agree on the same thing, perhaps. But I didn't see anything, and I only reviewed a fraction of the record because, as you say, it's enormous. I didn't see anything that suggested that there was still another alternative being out there, identified as something better. So everybody seemed to be preferring this integrated model. Well, but the judge said there's more than one way to have an integrated team, and you can do it like St. Alphonsus and hundreds of hospitals across America are doing it. You can have non-exclusive networks. You can work with independent doctors without owning them, without controlling them, without requiring that they deal only with you. That's the alternative. Is there any requirement that they deal only with St. Luke's? Excuse me? Your Honor. Is there any requirement in this contract that the Salser doctors deal only with St. Luke's? Well, several things, Your Honor. Number one, they are employees. I understand. Well, they're not really employees, but we're calling them that for purposes of this case. But where is the requirement in the contract that they deal only with St. Luke's? The evidence shows that St. Luke's has pulled its doctors out of other networks and have planned to pull them all out of other networks. The evidence shows that the judge found that it is virtually certain that referrals will shift as a result of their employment. But that's not the question I asked. I'm having trouble today getting answers to the question. I'm sorry, Your Honor. The question I asked is where is it in the contract that says that they can only deal with St. Luke's? Your Honor, I don't think it's in so many words in the contract, but I think the relationship, the way it is administered by their boss, St. Luke's, has that effect, and there was lots of evidence to show that. Didn't the judge find that there was no requirement that they refer patients to St. Luke's? They were perfectly free to refer them to your client? He said there was no requirement in the contract, but the evidence showed that those referrals would shift as a result of the operation. You said only. You said only. Well, the evidence also showed, Your Honor, that Luke's is pulling doctors out of competing networks. I think, is it the case? Here's my problem with your argument, and I'm not sure it makes any difference to the case. You're the monopolist hospital in Nampa. The notion that this is going to, you know, that there's some great antitrust violation that's going to hurt you, and the judge never found that, by the way, because he only dealt with the market, I find a little bit hard to buy on this record. I'm not sure it makes any difference to the judge's findings, but I don't see anything in this record that suggests that they're required to send patients to Boise rather than the nearby St. Alphonsus Hospital or that you're going to be affected in any way. I see findings that the insurers are going to be affected, and I take it that the finding is that through that consumers will be affected, but I shouldn't see a judge making any finding that you're going to be hurt. Your Honor, I do respectfully disagree, but I also think it's irrelevant to what you're doing, and I'd rather not take time at it. What I was trying to suggest by my response in terms of referrals, it's an example of how the employer controls the employees. That's as far as I was trying to go with that point. A few other things in response to your questions. If I could, on the ancillary point, there's a few things I can add factually and I think maybe a bit as to relevance. Number one, your question, you know, do you need to consider whether the judge would have come out a different way but for those findings? I think if you look at his analysis, it's quite clear that his analysis wasn't based critically in any way on those findings. You know, the analysis was, number one, there's a very high market share that creates a rebuttable presumption of this harm, and that presumption has not been rebutted. And number two, he found in findings 97 to 116, that this is going to create bargaining power in the primary care provider. So whether it also has effects on ancillary services, which was in later findings, is not at all essential to that result legally. I agree with you. It's not essential. Do you think it played any role in the judge's discretionary choice of remedy? I don't see how logically it could have, because if indeed the efficiencies are not merger specific, there's nothing to rebut the market share presumption and you're done. There's no logical way the judge could come to a different conclusion, even if those findings went away. And indeed, given all the other bases he's got, which he doesn't have to have to support the market share presumption, that's yet another way in which you're done. And I won't go through all the evidence on that. You know, the briefs are full of them. Beyond that, let me address the facts on the ancillary rates real briefly, Your Honor. Number one, I don't have the exhibits here with me, but I can tell you I took the deposition of Mr. LaFleur and had those documents in front of me, and I believe that if you looked at those exhibits, what they show is column one, pre-rates before the acquisition, column two, and this included commercial as well as Medicare, reimbursement before, reimbursement after. It went up after, and it's quite clear from the chart that you're talking the same volumes, the same units. So as a matter of math, the rates had to go up. That was certainly my recollection is the import of the exhibit and the import of the questions. I don't have the specifics of either in front of me, but I would be shocked if that were not the case. And certainly the Blue Cross testimony from Mr. Crouch was to the effect that, and the judge found this at finding 125, that there would be greater rates as a result, and Blue Cross has suffered that. And the hypothetical, is this tying, and do they have to have market power in ancillary services? A few answers, Your Honor. Number one, it's an interesting theory, but Luke's apparently didn't think so because they thought, based on those same exhibits I just described, that they could successfully raise the rates. And when you think about the mechanism here, you can see why. So they sit down, they have a negotiation across services, and Blue Cross and Luke's decide, okay, we'll take it in ancillaries as a matter of convenience, even though the negotiation included other areas where we have market power. Suppose Blue Cross the next day turns on a dime, tries to change its benefit design to encourage people not to use Luke's in ancillary services because they think they have alternatives. Number one, they can't turn on a dime and do that sort of thing. Number two, then in the next contract, Luke sticks it to another area. I'm having some trouble feeling sorry for the insurers as small lambs being taken over by a closer medical group in this one, but I understand the constraints of the Clayton Act. The insurers have real bargaining power here, don't they? I'm your Mayo hypothetical, and I don't know if this matters, but let me real briefly disagree a little bit with Mr. Marcus. Number one, I'm assuming you're saying that Mayo assembles some previously independent doctors and they get 80 percent. Number one, I think that would be a Section 1 violation of the Sherman Act and would be analyzed not too differently from Section 7. But number two, I can tell you I can't cite you a case here because I didn't expect this question, but we can provide the authority quickly. This is an issue we actually, the people who were trying the case, actually thought about a bit early on because we thought Luke might try to make an argument that given their professional services agreements that somehow they didn't fall under Section 7. And there is case law that says that Section 7 is quite broad and covers a wide variety of different specific arrangements. And I believe, not having looked at the cases in about a year or two, that Section 7 would cover even your hypothetical here. But in any event, Section 1 would. You don't need monopolization under Section 1. You need a harm to competition. And so I don't think, while structure can sometimes matter in these cases, I don't think it would here. Although the amount of monopoly power you need to violate Section 1 is significantly greater than the amount you need to violate Section 7, right? Well, it's not an incipiency standard. Yeah, that's certainly true, Your Honor. There is case law that says it's not much different. Mr. Marcus has handed me one of these exhibits in question. I'm not sure one can tell from the particular one he handed me whether it's rate or time. Why don't you just give us the exhibit number? We'll look at it later. ER-594. I'm not sure that establishes rate versus volume, Your Honor, that particular page. That's what I thought too, but I'll look at it again. You're now approaching deficit as great as your original allocation. So don't make any new points. Is there something you need to say in conclusion? No, Your Honor. I think I was going to go on to a new point, so I will sit down. Thank you. No, we appreciate it, but we do have to work under some constraints. And your client does pay by the hour, and we have to have consideration for your client. Now, Mr. Beard, you get the last word. Or I guess we do. And we probably don't get the last word either now, do we? I'd like to speak to the question that Your Honor asked, which is really a key question. How do we get the benefits of integrated care if the antitrust laws prohibit this kind of transaction? And the lawyers for Plankton stood here and said, well, the court found that there are other ways. I think we should look at what the court's other ways were. Because the court in its findings, in finding 179, it specifically states successful groups like Kaiser Permanente and Cleveland Clinic, I'm sorry I left out the Mayo Clinic, have mostly employed physicians. But then the court says, but physicians are committed to improving the quality of health care and lowering its cost whether they are employed or independent. And so he's saying, well, it really doesn't matter whether they're employed or independent. But that clearly flies in the face of the experience of entities like Kaiser and like Mayo. Physicians have been altruistic, have been interested in improving the quality of health care and lowering its cost since time immemorial. But unless they are in a system that is committed to moving to clinical integration and that is committed to moving to value-based delivery of care, the fact that they're altruistic, which is what the judge relied on as the alternative, is not going to do it. We can't have an antitrust law that prohibits this kind of change in our health care system that's going to increase access, promote quality, and ultimately reduce cost by moving to this value-based system. That's the first point I want to make. The second is, on this bond case, Mr. Marcus keeps saying, well, the Ninth Circuit has said that the burden of proof is on a plaintiff, on those less restrictive alternatives in Sherman Act cases, but not in Clayton Act cases. It should be the exact opposite, as Judge Hurwitz pointed out. Here, where the burden is so low in the Clayton Act to prove an initial prima facie case, you would think that the reasoning of bonds in Harrison would apply in Spain and that the burden should be on the government, on the plaintiff, to demonstrate that there are less restrictive alternatives. The question is not what could theoretically have happened. The question is what would have happened in this case. And if you look at the findings, or if you look at findings 25 through 31, if you look at findings 42 and 43, if you look at findings 45, you will see that the parties concluded that this transaction would not have gone forward, but for this tight affiliation. We've been looking at it from the point of view of St. Luke's, but let's look at it from the point of view of Salzer. They need to attract physician groups and new physicians. They need to be freed of the constraints that prevent them from treating Medicare and Medicaid patients. They want to have access to all these things, White Cloud and Epic, that they can get as employees. And without a tight affiliation, they can't get any of those things. Now counsel for the plaintiffs say, well, St. Luke's has this program whereby it's going to make Epic available to independent physicians. Well, it's true that they tried that, but part of that was that the independent physician group had to actually pay a substantial amount of money to get on the system. And to this day, no one, first of all, Salzer in the record has said we wouldn't do it, we couldn't afford it, and no other group has actually gone on the system. So this program that St. Luke's was looking at just doesn't work. I want to make one, I guess two final comments. Your Honor, they asked the question, well, is divestiture really going to restore competition? And the answer is it absolutely isn't. There is an affidavit in the record that was put in when we moved for a stay pending appeal, which was denied by the district court, in which the chief financial officer of Salzer basically said in that uncontested affidavit that if Salzer is divested, the likelihood is that Salzer will cease to be an effectively functioning entity that the physicians will all scatter. This $9 million thing isn't a thing that belongs to Salzer. That was given to Salzer physicians. That's not an asset of Salzer. And if you look at that affidavit, you will see that we are not going to be returning to the same competitive situation that we will have ex ante. The court seemed to be concerned about, well, this is a punishment that we're going to put on to St. Luke's, because after all, this transaction is what caused these seven physicians to leave Salzer. But as the court recognizes, the purpose of divestiture is to bring competition, to re-inject competition in the market, and on the facts of this case, one cannot conclude with any confidence whatsoever that this will re-inject competition. And finally, I just want to conclude with a comment in response to Judge Ruiz. Before this transaction, we had 12% of the physicians in Canyon County. We acquired the Salzer Medical Group. It's exactly the hypothetical you proposed, as if Mayo were to come into the market. The fact that we had 12% in advance does not create any kind of major monopolistic situation, particularly given the power of these payers, which control substantial sections of the market. So with all that, Your Honor, I think you've heard more than enough. I want to thank you very much for your courtesy in allowing all of us to speak for far longer than the time allocated. This is a very important case, obviously to the parties, but also to this country, and we appreciate all the thought that you're going to give to this case. So thank you very much. We thank you and the colleagues who spoke and the colleagues who worked without speaking for all your help. This is a difficult case. It's submitted, and we're adjourned.
judges: Clifton, Smith, Hurwitz